IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | | |
|---|---|---|
| SUSAN MURPHY, | ) | Civ. No. 06-00304 BMK |
| Plaintiff, | ) | |
| vs. | ) | FINDINGS OF FACT AND CONCLUSIONS OF LAW |
| UNITED STATES OF AMERICA, | ) | |
| Defendant. | ) | |

FINDINGS OF FACT AND CONCLUSIONS OF LAW

Plaintiff Susan Murphy filed this action against Defendant United States of America following a breast implant surgery she underwent at Tripler Army Medical Center ("Tripler"), which is owned, operated, and controlled by the United States. Two weeks after the surgery, Murphy noticed a dent and lump on her left breast and thereafter felt increasing pain. She eventually obtained a second opinion from a non-Tripler surgeon, Dr. Maxwell A Cooper, who explanted the implants and found a four-inch human hair attached to the left implant. Murphy contends that the United States is liable for medical malpractice based on the Tripler surgery and seeks general and special damages. The United States denies any negligent conduct.

Pursuant to 28 U.S.C. § 636(c), Fed. R. Civ. P. 73, and Local Rule 73.1, the parties consented to trial before a United States Magistrate Judge. This case was heard at a bench trial on December 16 and 17, 2008. Having carefully considered the evidence presented at trial and the arguments of counsel, the Court directs the Clerk of Court to enter judgment in favor of Murphy and against the United States. The Court's findings and conclusions are as follows:

## FINDINGS OF FACT

Murphy is a military dependent. In the early 1990s, she had cosmetic breast augmentation with silicone implants. She was satisfied with those implants until she learned that the silicone was possibly leaking. After seeking medical advice from physicians at Tripler, Murphy decided to replace the silicone implants with saline implants.

On December 9, 2003, Murphy was admitted to Tripler, where the risks, benefits, and expected outcomes of the surgery were explained to her. (Ex. 3.) Dr. Jeffrey T. Healy, with assistance from Dr. Donald R. Laub, Jr., performed an augmentation mammoplasty, in which the silicone implants were explanted and replaced with saline implants. (Id.) Murphy was discharged the next day.

Two weeks after the surgery, Murphy noticed a quarter-sized dent and a small lump or "knuckle" on her left breast above the nipple. She also experienced some discomfort, pain, tightness, and hardness. She met with Dr. Healy a few times, but he told her that it was due to swelling and would eventually heal. Murphy felt that Dr. Healy was trying to avoid her, and he ultimately told her that he could do nothing to address her concerns.

According to Murphy, the pain associated with the dent and lump on her left breast affected her daily activities. She stated she was unable to do chores around the house, exercise vigorously as she had done before, and even taking a shower hurt. At the time, she worked as a bartender and stated she was unable to extend her left arm above her head to reach bottles on high shelves. She also indicated she was unable to give her customers the friendly hug she usually greeted them with, and was embarrassed because her low-cut uniform made the dent and lump visible to customers. She bought expensive bras to disguise the dent and lump, but wearing a bra made it more painful. Murphy testified the discomfort negatively affected her intimate life, and the lump made her worried about having breast cancer.

Murphy eventually decided to get a second opinion from Dr. Maxwell A. Cooper, who has done several hundred breast implant surgeries during his

career. She met with Dr. Cooper for the first time on June 30, 2005. He listened to her complaints, examined her, and recommended that her left implant be removed and replaced at a deeper level under her chest muscles. He also recommended that her right implant be relocated under her chest muscles for symmetry. Murphy agreed with Dr. Cooper's advice.

On August 17, 2005, Dr. Cooper performed the surgery at Castle Medical Center. He worked on the right implant first, then turned to the left implant. After extruding the left implant, he noticed that the left breast pocket had a "tighter, thicker capsule" than the right pocket. When he turned the left implant over to examine it, he saw a four-inch black human hair stuck to the back side of the implant. The hair was soft and moist, indicating that it had been attached to the implant while in the breast pocket for a long time. He discarded the hair and completed the surgery. By November 30, 2005, Dr. Cooper noted that the result of the surgery was "excellent" and that Murphy was "pleased" with the results. (Ex. 2.)

At trial, the parties agreed that the hair had been in Murphy's left breast pocket since the 2003 surgery at Tripler. They also agreed that her left breast, when it was painful with a dent and lump, had a condition known as capsular contracture, which is normally painful. Capsular contracture is a

shrinkage of the natural scar tissue that forms around a breast implant and causes the implant to become tight and feel firm and hard. The primary dispute at trial was whether the hair found attached to Murphy's left implant caused the condition in that breast.

Dr. Cooper testified as Murphy's medical expert, free of charge. He explained that, in his own experience with breast implant surgeries, capsular contracture occurs in five percent of breast implant patients. He stated that capsular contracture, though not fully understood, is caused by anything other than an implant that is left inside the breast pocket. He stated that the presence of a foreign body, like bacteria or a human hair, would cause the condition. Because the hair found on Murphy's breast implant undoubtedly had bacteria on it, Dr. Cooper opines to a reasonable degree of medical probability that the hair caused Murphy's capsular contracture. Indeed, Dr. Cooper testified that the hair increased Murphy's risk of capsular contracture from five percent to "essentially one hundred percent."

Dr. Cooper further opines in his report:

> To a "reasonable medical probability" I believe that the hair was left in the implant pocket at the time of the previous breast implant surgery at [Tripler] on December 9, 2003 with Jeffrey Healy, MD, as surgeon of record. To a "reasonable medical probability" I believe that was below the standard of care. It is the

> responsibility of the surgical team: the surgeon, his assistant, the nurses, and other attending medical personnel to provide that a surgical wound be protected from significant "breaks" in sterile technique, which I believe resulted in this case, especially when any kind of foreign body device is to be implanted. The pain which Mrs. Murphy noted in the left breast, the hardness, and the "tender knuckle" were primarily caused or certainly very significantly aggravated by the hair being left in the pocket . . . .
>
> To a reasonable medical probability I believe that the pain and concern, both physical and mental, hardness, and the "tender knuckle" that Mrs. Murphy experienced in her left breast and which caused her to ask me to treat her and operate on her breasts resulted from the "breach of the standard of care" which occurred during the operation at [Tripler] [on] December 9, 2003.

(Ex. 2.)

Dr. Garry Brody testified as a medical expert for the United States. He is a Professor of Clinical Surgery at the University of Southern California and has received numerous awards and written many articles related to plastic surgery and breast implants. He did not examine Murphy but reviewed her medical records. He agrees with Dr. Cooper that the "cause of capsular contracture is unknown." (Ex. 104.) He stated that capsular contracture occurs in 10-20% of patients. According to Dr. Brody, if the hair found on Murphy's implant had caused the capsular contracture, it would have had "some inflammatory response around it." He explained that, to a 95% certainty, the hair would have been

surrounded by a scar. Because the hair was attached to the implant rather than embedded in a scar, Dr. Brody opines that the hair did not cause the capsular contracture.

During trial, however, Dr. Brody testified that capsular contracture may be caused by foreign bodies, including bacteria. He also stated that bacteria reside on hair and that Murphy's capsular contracture represents a response to a foreign body.

With respect to what caused Murphy's capsular contracture, while Dr. Brody's credentials are impressive, the Court finds more persuasive Dr. Cooper's opinion that the hair "primarily caused or certainly very significantly aggravated" her condition. (Ex. 2.) Both doctors agree that a leading cause of capsular contracture is bacteria. They also agree that bacteria reside on human hair. Dr. Brody's testimony that Murphy's capsular contracture was a response to a foreign body supports Dr. Cooper's opinion that the hair caused Murphy's condition. (Ex. 2.) The Court therefore finds, in agreement with Dr. Cooper's expert testimony, that the hair caused or substantially contributed to the capsular contracture.

CONCLUSIONS OF LAW

Original jurisdiction is based on the Federal Tort Claims Act ("FTCA"), 28 U.S.C. §§ 1346, 2671 et seq. Venue is proper pursuant to 28 U.S.C. § 1391(e)(2) as the events from which this case arise occurred within this district.

The United States is liable under the FTCA "in the same manner and to the same extent as a private individual under like circumstances," 28 U.S.C. § 2674, and "in accordance with the law of the place where the act or omission occurred," 28 U.S.C. § 1346(b). Because Murphy's surgery at Tripler took place in Hawaii, this Court applies Hawaii law.

Hawaii courts recognize that "medical malpractice cases have been predicated on the negligent failure of a physician or surgeon to exercise the requisite degree of skill and care in treating or operating on a patient." Bernard v. Char, 79 Haw. 371, 377, 903 P.2d 676, 682 (Haw. Ct. App. 1995). Under Hawaii law, "the plaintiff in a medical malpractice case based on negligent treatment has the burden of establishing a duty owed by the defendant to the plaintiff, a breach of that duty, and a causal relationship between the breach and the injury suffered." Id. In determining whether the defendant's negligent conduct was a "legal cause of harm" to the plaintiff, the plaintiff must show that the defendant's conduct was "a

substantial factor in bringing about the harm." Aga v. Hundahl, 78 Haw. 230, 236, 891 P.2d 1022, 1028 (Haw. 1995).

Unlike an ordinary negligence case, "a malpractice case based on negligent treatment cannot be established without expert medical testimony to support it." Bernard, 79 Haw. at 377, 903 P.2d at 682. Expert testimony aids in determining "whether professional conduct conformed to a reasonable standard of care and whether there is a causal relationship between the violation of a duty and an injury to the patient." Id.

Regarding the duty owed to Murphy, Dr. Cooper's written report states that the Tripler surgical team, including Dr. Healy, his assistant, the nurses, and other attending medical personnel, owed Murphy a duty "to provide that a surgical wound be protected from significant 'breaks' in sterile technique." (Ex. 2.) This duty was not disputed by the United States, and Murphy therefore established the first element of medical negligence.

Whether this duty was breached was disputed by the medical experts, but they agreed at trial that the hair had been in Murphy's left breast pocket since the Tripler surgery. According to Dr. Cooper, leaving the hair in Murphy's breast pocket "was below the standard of care" owed to Murphy. (Ex. 2.) The Court

agrees with Dr. Cooper's conclusion. Murphy established that the Tripler surgical team breached its duty to her.

Regarding the causal relationship between the breach and Murphy's injury, the Court, as noted above, is more persuaded by Dr. Cooper's expert testimony that the "pain which Mrs. Murphy noted in the left breast, the hardness, and the 'tender knuckle' were primarily caused or certainly very significantly aggravated by the hair being left in the pocket." (Ex. 2.) He treated Murphy, examined her left breast, and discovered the hair attached to the implant. Testifying for Murphy free of charge and because "it's the right thing to do" also boosts Dr. Cooper's credibility. Further, Dr. Brody agreed with him that, while capsular contracture is not fully understood, bacteria and other foreign bodies are the leading factors causing the condition. Moreover, Murphy had six breast implants inserted in her body over the years. The only time she had capsular contracture was after the Tripler surgery, and only in her left breast, where the hair was found. It was the same breast that had a dent and lump, and was painful, tight and firm. Considering the hair (a foreign body itself) found attached to the implant was undoubtedly covered with bacteria (other foreign bodies), and that Drs. Cooper and Brody testified that foreign bodies cause the condition, the Court concludes that Murphy established the hair was "a substantial factor in bringing

about the harm." Aga v. Hundahl, 78 Haw. 230, 236, 891 P.2d 1022, 1028 (Haw. 1995).

In sum, Murphy has established that (1) the surgical team at Tripler owed her a duty to ensure that her surgical wound be protected from breaks in sterile technique, (2) the Tripler surgical team breached that duty, and (3) and a causal relationship exists between the breach and Murphy's injuries. Bernard, 79 Haw. at 377, 903 P.2d at 682. Murphy has proven the United States is liable for negligent medical malpractice and is therefore entitled to general and special damages.[1]

Murphy is entitled to general damages, which include "damages for pain and suffering, mental anguish, disfigurement, loss of enjoyment of life, loss of consortium, and all other nonpecuniary losses or claims." Haw. Rev. Stat. § 663-8.5; Bynum v. Magno, 106 Haw. 81, 85, 101 P.3d 1149, 1154 (Haw. 2004). Murphy is not entitled to recover for the routine expected pain that was associated with the 2003 surgery. She is, however, entitled to recover for the increased discomfort and the unsatisfactory appearance of her left breast caused by the capsular contracture. Although the Court is not persuaded that the amount of

[1] Having found the United States liable for medical negligence, the Court need not and does not address Murphy's second theory of liability: breach of the duty of informed consent.

Murphy's pain or disability was as great as she stated at trial, the Court acknowledges that she had moderate discomfort, which affected, to some extent, her daily activities. The Court also notes that her worries of breast cancer were justified. Indeed, her worries and concerns drove her to seek a second opinion from Dr. Cooper.

According to Dr. Cooper, "it was necessary to explant and reimplant the left implant" and "it was also advisable to do the same procedure to the right breast so as to achieve symmetry and not produce another problem." (Ex. 2.) Murphy followed his advice and underwent the 2005 surgery, which Dr. Cooper testified is typically very painful. As with all surgeries, there is a risk of complications or unexpected reactions to anaesthesia, which worried Murphy. The surgery was uneventful, however, and Murphy returned to work "early" and had "excellent early results" by November 30, 2005. (Ex. 2.) For all of these noneconomic damages caused by the United States's medical negligence, the Court awards Murphy $30,000.

With respect to special damages, the Court awards Murphy damages associated only with the 2005 surgery and not the 2003 surgery. Regarding Murphy's lost wages and tips, she testified that she missed two weeks of work and typically worked six days a week, nine hours a day. She was paid an hourly wage

($8/hour) for only four of the six days, however. Thus, over a two week period, she lost a total of $576 in hourly pay ($8/hour x 9 hours/day x 4 days/week x 2 weeks = $576). Six days a week, Murphy made approximately $250 in tips daily but had to pay one-third of that to other workers in the bar. Over a two week period, Murphy lost a total of $2100 ($250/day - 30% = $175/day x 6 days/week x 2 weeks = $2100). Murphy is therefore entitled to $2676 ($576 + $2100 = $2676) in lost income associated with the 2005 surgery.

Regarding her medical bills, Murphy seeks to recover $960 for the cost of the implants. She testified that she paid $960 for the implants in 2003 and that they were reused in the 2005 surgery. Because Murphy did not pay for implants in 2005, Murphy is not entitled to recover $960 for the cost of the implants.

Although Murphy paid only "$49.50 out of pocket for the 2005 surgery for all expenses related to the surgery, including the surgeon, the anesthesiologist and the hospital," she seeks to recover the following amounts that were billed to and paid by TriCare Prime: (1) $10,645 billed by Castle Medical Center, (3) $8,240.57 billed by Dr. Cooper, and (4) $1,563.54 billed by Dr. Hunter (anesthesiologist). In response, the United States argues that these amounts

(totaling $20,449.11) paid by TriCare are not recoverable as collateral source payments.

According to the stipulated testimony of Terri L. Cloud, who is "Chief, TriCare Operations Branch, Managed Care Division at Tripler," military dependents have the option of receiving one of two TriCare benefit plans. They may receive "TriCare Standard" at no charge, which is a fee-for-service plan with a deductible plus a cost share paid by the beneficiary. For an annual fee of $460 per family, dependents may receive "TriCare Prime," which is "a managed care-HMO type plan . . . with lower out of pocket costs." In 2005, Murphy and her spouse paid the $460 fee for TriCare Prime coverage. This reduced her total out-of-pocket costs for the 2005 surgery to $49.50.

The parties dispute whether Murphy may recover the $20,449.11 that TriCare paid for the 2005 surgery. "A plaintiff in a FTCA suit can recover damages from the United States in addition to compensation from a collateral source." Mays v. United States, 806 F.2d 976, 977 (10th Cir. 1986). In Mays, the Tenth Circuit decided "whether benefits received from the Civilian Health and Medical Program of the Uniformed Services (CHAMPUS) are a collateral source to a FTCA award." Id. at 976. The court noted that "government payments are collateral if the payments come from 'a special fund that is separate and distinct

from general government revenues' and to which the plaintiff has contributed." Id. at 977 (quoting Berg v. United States, 806 F.2d 978, 985 (10th Cir. 1986)). After finding that "CHAMPUS payments come exclusively from the general revenues of the United States," the court held that "such payments are not from a source collateral to the United States." Id. The court remanded for modification of the damage award, noting: "To award damages for a loss for which the United States has already compensated the plaintiffs would be to allow a double recovery." Id. at 978.

In arguing that she is entitled to recover the $20,449.11 that TriCare paid for the 2005 surgery, Murphy asserts that "[a]ll of the funds for the TriCare Prime Program do not come exclusively from the general treasury of the United States as evidenced by the $460 payment that [she] made for TriCare Prime coverage." (Plaintiff's Supplemental Trial Brief at 2.) However, even if Murphy could establish that the $460 payment is a "contribution" that "is paid directly into the fund," she has not shown that the TriCare payments "come from 'a special fund that is separate and distinct from general government revenues.'" Mays, 806 F.2d at 977. To the contrary, "[t]he vast majority of courts to consider this issue . . . have concluded that TriCare/CHAMPUS benefits are not a collateral source, holding that they are benefits derived from general revenues of the United States."

Lawson v. United States, 454 F. Supp. 2d 373, 414 (D. Md. 2006) (emphasis in original). Absent a showing that the TriCare payments come from a "special fund that is separate and distinct from general government revenues," Mays, 806 F.2d at 977, Murphy fails to meet her burden of establishing her entitlement to recover payments made by TriCare for the 2005 surgery. The Court therefore awards Murphy only her out-of-pocket costs associated with the 2005 surgery, which total $509.50 ($460 payment to TriCare + $49.50 out-of-pocket cost for the surgery = $509.50).

In sum, the Court awards Murphy $30,000 in general damages, and $3185.50 in special damages relating to the 2005 surgery ($2676 in lost income + $509.50 for out-of-pocket costs = $3185.50), for a total of $33,185.50.

The Clerk of Court is directed to enter judgment in favor of Murphy in the amount of $33,185.50.

DATED: Honolulu, Hawaii, February 23, 2009.

IT IS SO ORDERED.




/S/ Barry M. Kurren
Barry M. Kurren
United States Magistrate Judge

Susan Murphy v. United States of America, Civ. No. 06-00304 BMK; FINDINGS OF FACT AND CONCLUSIONS OF LAW.